a minor and in the interests of Isaiah S. a minor, cases 518-0409 and 518-0410. Counsel ready? Yes. You may proceed. Thank you, Judge. Good morning, Your Honors. If you may please the court and counsel, my name is Timothy Hutspeth and I represent the respondent appellant in this matter, Al David S. He is the biological father of the two minors involved. Your Honors, we're not dealing with a complicated set of facts in this case. Things are relatively short and I think most facts are likely agreed upon. March 16, 2018, we begin with a petition for adjudication of worship and a shelter care hearing. At that shelter care hearing, there's testimony from a DCFS caseworker and there's a recommendation given by the guardian ad litem. The reason for the shelter care hearing, for the petition being filed, there were three different allegations in that petition, each of which had to do with the mother of the children. None of them had to do with the respondent. At that hearing, the DCFS caseworker testified as to where the minors should be placed, as to where the minors should be placed, and for worship. Alice Badger testified, she's a DCFS caseworker, that the respondent lived in a safe residence. She was unaware of the respondent having a drug history. The respondent, in fact, took a drug test that day and came back clean. He checked on the minors, whether they were with their mother, if he thought there was some concern. She was not concerned with the minors being placed with the respondent. She thought that it actually was appropriate. Now this is several months before we get to the dispositional order, which is what we're actually appealing. That order was entered on August the 8th, 2018, but they're important because it shows at the very outset of the case, DCFS, the guardian ad litem, recommended to the court and voiced their confidence and their comfort with the minors being placed with the respondents. The case progresses. We have an integrated assessment that my client completed his portion in June. Then we come to an adjudicatory hearing, and finally the dispositional hearing. At the dispositional hearing, we have testimony from a different DCFS caseworker. We have testimony from the respondent. During that testimony, the caseworker reviewed an adjudicatory report that was filed back in June. At the hearing, we learned that the minors were actually taken from the respondent just 13 days after they were placed with him. They were placed with him on March 16th. They were taken from him on March 29th and replaced elsewhere. When a question is asked to the reasoning for that change in placement, the caseworker, Ms. Zerlini, gives several vague reasons. One being that the respondent was not adhering to DCFS expectations and not providing the minors a stable home environment. What does that mean? We have no idea. There is no further testimony about that. Just that broad statement is made. There was also concern about one of the minors having dental problems that had not been addressed. Keep in mind, the minors were not living with the respondent until March 16th. They were then placed elsewhere on March 29th. Less than two weeks. And that was apparently not acting quickly enough to get the minor dental care. Admittedly, we would be there if things can be done the next day, but in reality, that's typically not how things work. Wasn't there something about your client taking the kids to the caterer and, I don't know, living with a relative or a hotel? There was certainly an issue of housing stability. That's correct, Judge. I think those may be two different issues. I'll let you draw them up and I'll address each of them. As to my client taking the minors to the caterer, Ms. Zerlini testified that there was miscommunication about that and that the fact that my client had consent to take the children to the caterer had apparently not been communicated within DCFS. So it seems as though he had the permission of the original caseworker, Ms. Badger, to take the children to DCFS, and then the record is unclear as to who found out or who didn't find out about that. But that is one of the bases that they relied upon in changing placement. Well, why is my client being punished when he had permission from the original caseworker to take the children? I wish there were more details in the record as to kind of what took place, but there's none. What is clear, though, is it says, Ms. Zerlini says, he had permission and it was not communicated within DCFS. I would submit that should not be a basis, then, to rely upon for changing the placement of the children, to take them from their father, when he had permission to do something, he did that, and now all of a sudden that's getting him in trouble. Then there are other questions about the motel and the stable housing. When the mother replaced with my client on March 16th, he was living in a small motel room on North Elm Street in Centralia. At that time, DCFS caseworker, guarding that line, said, yeah, maybe it's not the best, but we don't have safety concerns about it. They've allowed the minors to be placed with my client, knowing he was living in that small motel room. Then, at the dispositional hearing, when asked, my client, during his testimony, he's asked, where are you living? He says, I'm living in a two-bedroom apartment on West McCourt Street in Centralia. I've been there for a couple of months. In fact, he testified, that's where DCFS picks him up and takes him to visits with the children. Now, apparently, the caseworker, Mrs. Zerlini, she clearly was not the one who picked him up, because she didn't know that he was living there. She said, he's still living in this motel room on North Elm Street. Obviously, that's incorrect, but even if he was still living there, it was fine back on March the 16th. It was safe. The record doesn't show anything that's changed about that motel room, if he were still there. So, why would it matter if he was on North Elm in a one-bedroom motel room, or if he was on West McCourt in a two-bedroom apartment? The fact is, he did find better housing. He signed the one-year lease, according to his testimony. So, he took a step up in the housing market. Shouldn't that be something in his favor, then, that would bode well for the children to be placed with him? It seems like there was a breakdown in communication that took place in this here. So, obviously, the state viewed that as the illness was on your client. But, I remember there was an issue about releases. The state testimony from DCFS was three times the father refused to sign releases, so we can verify housing, and I guess employment. How do you address those issues? Judge, at least one of those occasions, I believe this came from Ms. Zerreen. I don't know if it was their testimony at the dispositional hearing. I believe that it was. But, she stated that, allegedly, my client had not signed releases, pending a conversation with his attorney. Again, I would submit that my client should not be punished for only to consult his attorney about what he's signing. That's kind of step one in how to be a good client. As you talk to your attorney about what's going on, you review things, you ask your questions. Now, in the juvenile world, it's expected that things happen quickly. My client, the record shows, was represented by a popular and kind father defender. It's not as easy to get him to see them sometimes as maybe it is a private attorney. So, there was likely delay between the time that he was presented a release or asked to sign it and when he would get in to discuss that with his attorney. He also testified that he did sign a release at Community Resource Center. He signed a release or something so that DCFS could get a copy of his lease from his landlord. So, while the caseworker is saying he didn't sign a release, he's saying he did. And the caseworker is acknowledging one of the reasons he did is he wanted to talk to his attorney. That, again, is a proven course of action. It should not be held against him as a basis for finding him unfit placement for the children. Another reason that the placement appears to have changed was the belief that the minors were not being fed nutritious and appropriate food. The belief that they were not being fed healthy food. That's all that's said about it is the belief. There's no indication, there's no alluding to any other facts to why that belief was held. They just thought that was the case. There was nothing to verify or confirm that. Again, the simple belief that something is taking place without more to support that and back that up should not be a basis for taking custody from or changing placement from the father, from my client, and placing the children into a traditional foster setting. Getting back to the communication issue. Both sides, both DCFS and my client, couldn't communicate or couldn't shoulder some of the responsibility for communicating with each other. But when we're talking about the move to Decatur or taking the children to Decatur, that appears to be purely internal communication with DCFS. If my client is told by his caseworker, yes, you can take them to Decatur, it's not his job to tell everybody else in DCFS, hey, Ms. Battersack will take the kids to Decatur. That is purely within DCFS's responsibility to make sure that their offices know what's been allowed and what permission has been granted. My client couldn't do anything under that scenario or do anything with that permission to make sure that the other DCFS caseworkers, employees, investigators, and whoever else knew that he had permission. And I don't think that we should expect that there was anything else that he could do. What about some testimony about the children witnessing some domestic violence between the father, the client, and the mother, and therefore DCFS requiring the father to attend men challenging violence classes? Apparently that didn't happen. That's correct. I don't think that it happened as of the disposition hearing in August. My client completed his portion of the integrated assessment, I believe it was June 4th. The family service plan that was prepared was actually dated May 3rd, so it would not have had anything specific about what services my client needed. Anything in there as to him would be based upon beliefs, speculations, and some secondhand knowledge that DCFS may have. After he completed the integrated assessment then in June, there was the integrated assessment report that was filed, I believe before the either June or July hearing, but there wasn't actually a new family service plan created prior to that August dispositional hearing. So yes, it was recommended that he take those classes. We don't know when he was told that he was to take those classes. I don't think there was any indication that he signed acknowledging he received that family service plan. I don't know that there was testimony from a caseworker that they went over a service plan with him. I don't think he was admonished by the judge at any hearing that you have to go along and do what this says. If he was, it would have been, again, prior to his completion of the integrated assessment. So he wouldn't really know, and DCFS wouldn't really know, and the court wouldn't really know, well, what does he have to do? You have to do what DCFS tells you, but they don't know what to tell you to do yet until you complete the integrated assessment. So he was required to do it, but I don't really think that it was necessarily he had had six months and still hadn't done anything. He was required to find employment, stable employment, stable housing. By his testimony, he did that. Again, two-bedroom apartment on West McCord, full-time job at Eagle Recycling, got paid weekly. Any issues as to communication I would submit are on the side of DCFS. They appear to make a big deal about this Decatur trip that he had permission to take with the children. He testified stable housing. He testified he got a job. Nobody argues that he doesn't. Now, the caseworker says, well, I don't know. I wasn't able to prove it. Well, now he's testifying. He's plainly saying, yeah, I'm living in a two-bedroom place and I got a job. In March, the motel room was good enough. DCFS and the guardian were comfortable with the children being with my client. From March to August, what does he do? He gets a better apartment. He's got a job, but he takes the kids to Decatur with permission. Now, suddenly, he's not good enough. That's not the place that he's supposed to be. I'm sorry, that's not the place the children are supposed to be. I know the best interest of the children is not always a high hurdle here for the state to clear, but at the same time, it doesn't really look as though my client has done anything negative from the time the case was opened, and at that time the case was open. The children were fine with him. Thank you, Your Honor. Good morning, Your Honor. This is the Maine Police and Court Council. For the record, my name is Patrick Daly. I'm here on behalf of the people of the state of Illinois. I want to start off first by mentioning this court's standard of review. This court views the lower court's dispositional decision for an abuse of discretion. That's often described as an abuse being a decision that's arbitrary, fanciful, or a decision that no reasonable person would view to be reasonable to be adopted by the trial court. One court has even mentioned that it's virtually no review at all. I don't know if they go quite that far, but it is a highly deferential standard of review. Given that circumstance here, the juncture of this case at this point is we've passed the adjudicatory stage. At the adjudicatory stage, there was an admission that the mother, all the allegations in the petition were involving the mother, that the mother and aunt had gotten into a physical altercation. At that point, the court then acquires jurisdiction to proceed to the dispositional stage, where then the focus of the court becomes not on whether there's an incidence of neglect or abuse, but whether or not what is now going to be in the best interest of the minor or the minors going forward, or whether these minors should be made wards of the court. Of paramount importance in that regard is with whom should the minors be placed. The court has a variety of options. By statute, it could place them back with one of the parents. It could place them with the parents with conditions that contingent upon the parent completing services. It can place them with DCFS, or the minor can be declared emancipated if the minor is old enough. So here, where the core principle concern and principle focus is on the best interest of the child. That is the beginning, the end, and the middle of the court's inquiry here. In this case, when we look at the evidence before the court, which consisted of both the testimony of Rebecca Zerlean, as well as a dispositional report that the parties agreed to allow the court to consider for evidentiary purposes, that there was considerable evidence for the court to find that it was in the best interest of the children, that they remain in their caregiver's custody in that IMD and visa ream of DCFS and not with this individual father. Now, I would note that this is, you know, just a step in the process. There could be a condition at some point further on down the road where the father may be able to gain, you know, physical custody of the children again. But at the point where it's a time of dispositional hearing where the court has to make a decision, it has to consider before it the facts that it has been presented. It's true the counsel indicates that at one point the minors were with the father. Now, the report, the dispositional report indicated the circumstances in which the reason why that that placement was terminated. One was because the minor was having tooth issues, tooth decay that was not being treated. The children were being fed a diet of junk food. They had not been enrolled in a pre-kindergarten program. And maybe most concerning, there was indications that the father was still having contact with the mother. The mother, you'll see references in the record, had a lot of problems, particularly related to substance abuse. So this is one, just one of the considerations that the court has at disposal. Number two of equal importance, maybe greater importance, was the background of violence and domestic violence in the household. Hope was interviewed by DCFS and indicated to the worker that she had witnessed conflict and violence between the mother and father and that the father responded had struck the mother in the past. Further, not mentioned here during counsel's argument, was the father has also been convicted of battery involving another woman. Now, this is all important for two reasons. Number one, we got here to this point because the children were in an injurious environment involving violence. Granted, the adjudication involved violence involving the mother in the hands. But nonetheless, this is the background that we have. So this is what the children have been exposed to. And when the court looks at what the best interests of the children are going to be, it has to take into consideration what is this environment that they're coming from. Second of all, this now relates to the respondent's refusal to sign the releases. Services were recommended by DCFS, parental counseling, domestic violence perpetrator treatment, as Ron had indicated, the men challenging violence program. That was among, you know, one of the principal concerns of DCFS. But without the releases, there's no way for DCFS to verify whether the respondent is, in fact, in compliance or participating in these services. Naturally, the court, considering the totality of the circumstances and the best interests of the minor, is going to be particularly concerned about placing the children back with the respondent when there's no ability or access to determine whether or not the issues that stem both from the household and from the father himself are being satisfied so that these children can be placed in a safe environment. Furthermore, and finally, the court considered the fact and heard evidence and considered evidence that the children were currently in a stable caregiver environment. They were doing well in the household. They were doing well with the caregiver's six-year-old child. The caregivers were keeping the parents apprised of the children's status and their situation. So when viewed in total, in fashion of dispositional order, there's ample evidence for anyone to see, as the court can see, that it was not a piece of discretion, taking all that into consideration, for the court's belief that the appropriate disposition in this case was to make the children the Lord of the court and that DCFS be given custody of the children pending further proceedings. Does the court have any questions for me? We respectfully ask this court to confirm the judgment. Thank you. Briefly, Your Honor, Superintendent Bono, the inquiry was in the best interest of the minor. The minor daughter made statements that she missed her parents. She received support from the respondent. Following visits, she returned to the foster home crying, saying that she missed her father. That's a bond that we don't always see in juvenile cases, and I think that should bear great weight on what's in the best interest of these children. They probably are in a great foster home. I struggle in these cases when we're talking about the foster parents because they probably do great work, and they receive children who are in a hard place in life. So it's admirable that they're able to provide a stable and a loving home. And while that does go to the best interest of the children, I think we need to be careful not to place all the emphasis or make our own inquiry on whose home is better, biological parents or foster parents. Because just like the children who are in the foster care in a tough situation, maybe the parents are also in a tough situation as well. I would just caution or request that we don't focus purely on whose house is better, dad or the foster parents. In regards to contact with the respondent and the mother, they were living apart. They were not together. The record doesn't say they were still in a relationship. So any past allegations of battery or domestic violence, when they're not together, when they're living separately, I don't think we're comparing apples to apples. It's not the same situation when they're living separate apart than it is when they're together in a relationship or living together. Your Honor, we ask that the August 8th dispositional order be vacated and that the children be placed with my client. Thank you. All right. Thank you, counsel, for your arguments. The court will take this matter under advisement and render a decision due course.